KLIEBERT, Judge.
Kathy Lacassagne was cast in judgment for $288.09 plus legal interest and costs in a suit alleged to be on an “open account” brought by Don Boudreaux’s Fine Jewelers, Inc. Lacassagne appeals and urges us to reverse the judgment because her trans *560 action with Boudreaux’s was not a sale on an open account but, rather, a contract to build a customized piece of jewelry which did not ripen into a sale because Bou-dreaux’s did not build the jewelry according to specifications. Boudreaux’s has not filed a brief responding to Lacassagne’s contentions. We agree with Lacassagne’s contentions and hence reverse and set aside the money judgment against her.
In February 1987, Boudreaux’s filed a suit against Kathy Lacassagne entitled “Petition on Open Account.” Kathy answered, denying any indebtedness, or that she maintained an open account with Bou-dreaux’s for “services” and, alternatively, in the event the court found an account was opened, averred that the jewelry had not been made as requested. At trial counsel for Boudreaux’s sought only to prove an outstanding balance on an open account and made no effort to introduce evidence to show Boudreaux’s compliance with a contract to construct a piece of customized jewelry. Only Kathy and Karen Keen, account manager for Boudreaux’s, testified.
Kathy testified the Lacassagnes had purchased jewelry from Boudreaux’s for over twenty-five years and considered the Bou-dreauxes to be their friends. In 1985 Kathy met with Don Boudreaux for the purpose of ordering a custom-made tie clasp to match a set of cuff links owned by her husband, Herb. The cuff links and a matching tie clasp had been custom-made by Boudreaux’s for Herb’s father and were inherited by Herb. Herb misplaced the original tie clasp. Kathy wanted Bou-dreaux’s to construct a tie clasp to replace the missing one so she could present it to Herb for Christmas. She showed Don Bou-dreaux one of the cuff links and drew a diagram of the tie clasp she wanted constructed. The face of the cuff links was the size of a quarter and was imprinted with the emblem of the Lacassagne family business. The tie clasp was to match the cuff links.
When Kathy picked up the tie clasp on December 24, 1985, it was already gift wrapped; thus, she was unable to inspect it. When the clasp was unwrapped at her mother’s home on Christmas morning, Kathy learned the clasp she had picked up did not meet the specifications of the clasp she had requested Don Boudreaux to build. The clasp was smaller and lighter than the cuff links, the company emblem was not on the end, and the clasp appeared tarnished.
The Lacassagnes decided to return the clasp to Boudreaux’s for reworking. Hence, when they returned to their home a few weeks later Kathy tried to contact Don Boudreaux by telephone. She was unable to reach him and he did not return her call. Time slipped by, and the Lacassagnes began receiving bills for the clasp. According to Kathy, her husband was to and did talk to Don Boudreaux but she did not know what was said. She personally returned the clasp to Boudreaux’s. She did not know exactly when. She also spoke with Karen Keen, account manager for Boudreaux’s, at some point (unclear as to when) and informed her that Herb wanted Don Boudreaux to rework the clasp. Kathy denied she had offered to pay for the clasp.
The account manager, Karen Keen, identified the account card showing the charge for the clasp was $253.80 with $34.29 in interest added on. There was nothing on the card to show Kathy had acknowledged receipt of the clasp or opened an interest bearing account with Boudreaux’s. Moreover, although a certified letter addressed to Kathy and received by a Mrs. Mount was introduced, Kathy denied receiving it and the record does not show any eonnexity between Kathy and Mrs. Mount.
Karen Keen’s testimony, however, did contradict some of Kathy’s testimony. Karen said the Lacassagnes did not, to her knowledge, attempt to return the clasp pri- or to the filing of the suit, and did not forward payment despite Kathy Lacas-sagne’s assurances in July of 1986 that a check was forthcoming.
While delivering his reasons for judgment, the trial judge said: "... I don’t doubt your client [Kathy] wasn’t satisfied, and I don’t doubt that it wasn’t done to specifications that she wanted ...” and then went on to say he did not “think *561 Boudreaux should be held responsible for this, because they weren’t given the opportunity to correct the situation ...” (i.e., because twenty months expired before the tie clasp was returned to Boudreaux’s by Lacassagne).
On appeal counsel for Kathy argues the trial court erred in concluding there was a consummated contract of sale and in acceding to Boudreaux’s position the suit was solely one on an open account. We agree with Kathy’s counsel.
A contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. The contract is perfected when three circumstances occur, to-wit: the thing sold, the price, and the consent. La.C.C. Article 2439; Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980). On the other hand, a building contract is an agreement by which a workman hires out his labor or industry to make buildings or other works for a certain stipulated price. La. C.C. Articles 2745, 2756.
Plaquemines Equipment & Machine Co. v. The Ford Motor Company, 245 La. 201, 157 So.2d 884 (1963) involved a contract, the object of which was a specially built truck to be installed on a standard cab and chassis. The dealer surrendered the cab and chassis to the Ford Motor Company prior to making the installation required to place the truck in deliverable form. The buyer claimed ownership of the truck. In holding that the contract remained exec-utory and did not ripen into a sale, the Supreme Court stated:
It is clear that future things may be the object of a sales contract.2 Commercial transactions involving objects to be manufactured or fabricated are quite common. Such a contract is not aleatory, but certain, since the price is to be paid for a specific future object, the production of which depends upon the will of the seller.3
In the absence of an expression of intent to the contrary, such a contract is not immediately translative of the ownership of any property. Title to the future thing cannot pass for it is not yet in existence. Title to the component parts does not vest in the purchaser because they are not the object of the contract. ******
In express terms, Article 2439 requires the concurrence of the thing sold, the price and the consent for the perfection of the contract of sale. If the thing sold has not come into existence, as in the instant case, the concurrence is lacking.5
Article 2456 provides for the vesting of title in the purchaser by operation of the law prior to actual delivery. For the transfer of title to be operative under the Article, the object of the contract must exist in a deliverable state. The law does not presume to pass title to anything other than the object of the contract.
As between Boudreaux’s and Kathy Lacassagne, there was an oral contract to sell a tie clasp to be manufactured according to certain specifications set forth in detail by Lacassagne. The major property which the clasp was to exhibit was that it had the company emblem and matched the cuff links. Until the clasp was constructed to the specifications given, i.e., placed in deliverable form, the contract remained ex-ecutory. Plaquemines Equipment Co., supra. Kathy Lacassagne’s testimony that the tie clasp did not conform to the specifications she gave Don Boudreaux was unre-butted. The trial judge found that the clasp was not constructed to the proper specifications. As the object of the contract did not exist in a deliverable state, the contract did not ripen into a sale.
The trial judge was troubled by the twenty month period during which the Lacas-sagnes retained possession of the clasp. However, the delay is explained by the fact that the transaction was between friends, and a $288.00 tie clasp was not the focal point of the Lacassagnes’ lives. Although held by the Lacassagnes, it failed to meet the specifications ordered and hence was of no use to them.
Boudreaux’s failure to perform in accordance with the specifications and drawings *562 submitted by Kathy prevented the contract from ripening into a sale. Therefore, Kathy was under no obligation to pay for the performance. Although tardy, she did return the improperly constructed tie clasp. Accordingly, the money judgment in favor of Boudreaux’s Fine Jewelers, Inc. and against Kathy Lacassagne is reversed and set aside at Boudreaux’s cost.
REVERSED AND SET ASIDE.
WICKER, J., concurs.